Filed 6/10/13  P. v. Butler CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B236056 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. TA110580) |
| DONYELL LADALE BUTLER, | |
| Defendant and Appellant. | |

APPEAL from judgments of the Superior Court of Los Angeles County.  Laura R. Walton, Judge; Paul A. Bacigalupo, Judge.  Affirmed with modifications.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Two juries convicted defendant and appellant Donyell Ladale Butler of attempted murder, assault with a firearm, and possession of an assault weapon.

He appeals from the judgments and contends that (1) the prosecution committed prejudicial misconduct, (2) the trial court erred by refusing to dismiss two jurors, (3) the trial court erred by refusing defense counsel's request to instruct the jury on attempted voluntary manslaughter, (4) the trial court erred when it instructed the jury with CALCRIM No. 361 (failure to explain or deny adverse testimony), (5) the trial court erred when it overruled a defense objection to a hypothetical question posed to the gang expert, (6) the trial court erred in calculating the length of the sentence for the gang enhancement on the count for possession of an assault weapon, (7) the trial court erred in failing to award presentence custody credits, (8) there was insufficient evidence that defendant was the shooter, (9) the abstract of judgment should be corrected to reflect the proper sentence on the count for possession of an assault weapon, and (10) the case should be remanded because the abstract of judgment does not accurately reflect the oral pronouncement of the court.

We agree that the trial court imposed an incorrect sentence for the gang enhancement on the count for possession of an assault weapon and modify the judgment. We also find defendant was entitled to presentence conduct credit. In all other respects, we affirm the judgment.

## BACKGROUND

### 1.    Procedural History

The underlying proceeding involved three trials. In the first trial, the Los Angeles County District Attorney charged defendant with: attempted murder (count 1, Pen. Code, §§ 664/187, subd. (a));[1] assault with a firearm (count 2, § 245, subd. (a)(2)); possession of an assault weapon (count 3, § 12280, subd. (b)); and kidnapping (count 4, § 207, subd. (a)). The amended information alleged that the attempted murder was committed willfully, deliberately, and with premeditation, in violation of section 664,

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

2

subdivision (a). As to count 1, it was alleged that defendant personally inflicted great bodily injury and used a firearm (§§ 12022.7, subd. (a), 12022.53, subds. (b)–(d)). As to counts 2 and 4, it was alleged that defendant personally used a firearm (§ 12022.5, subd. (a)). With respect to all counts and pursuant to section 186.22, subdivision (b)(1)(C), it was alleged that the offenses were committed for the benefit of a street gang. Finally, it was alleged that defendant had served two prior prison terms within the meaning of section 667.5, subdivision (b), and had suffered one prior serious or violent felony conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

The first jury found defendant guilty of possession of an assault weapon in count 3 and found the gang enhancement to be true. Defendant was found not guilty of kidnapping in count 4. The jury was unable to reach a verdict on counts 1 and 2, and a mistrial was declared as to those counts.[2]

The second trial resulted in another deadlocked jury on counts 1 and 2, and a mistrial was again declared.[3] Following a third jury trial, defendant was found guilty on counts 1 and 2, and all firearm and gang allegations were found to be true. The court conducted a bifurcated jury trial on the prior conviction allegations, and the jury found the allegations true–that defendant had served two prior prison terms, and suffered one prior serious or violent felony conviction.

The trial court sentenced defendant to a term of 44 years to life in state prison, calculated as follows: on count 1 for attempted murder, life with the possibility of parole after a minimum term of 14 years, plus a consecutive term of 25 years for the firearm enhancement, and two consecutive one-year terms for the prior prison terms pursuant to section 667.5, subdivision (b), and on count 3, a consecutive term of one year and four months (one-third of the mid-term doubled pursuant to the "Three Strikes" law) and a consecutive term of one year and eight months for the gang enhancement (one-third of

---

[2]     The jury was deadlocked at nine for guilty and three for not guilty on both counts.

[3]     The jury was deadlocked at eight for guilty and four for not guilty on both counts.

the five-year term).[4]  The court imposed a three-year sentence on count 2 which was stayed pursuant to section 654.

Defendant was ordered to pay a $2,000 restitution fine (§ 1202.4, subd. (b)) and a parole revocation fine (§ 1202.45) in the same amount was imposed and stayed. Defendant was ordered to pay a $60 court security fee (§ 1465.8) and a $40 criminal conviction assessment (Gov. Code, § 70373).[5]

### 2. Statement of Facts

#### a. Prosecution Evidence

On January 21, 2010, defendant and his friends were in the bar area of T.G.I. Friday's restaurant in Compton.  It was karaoke night and the bar was crowded. Defendant, who wore dark pants, a long-sleeved blue shirt, and a blue beanie, was at a booth near the back wall.  A group of people seated at tables close to the bar wore red baseball caps with the letter "W" on them.  The group reacted to a song on the jukebox and flashed gang signs and shouted "Westside Piru."  They also shouted "Saaawoop," which was a battle cry used by gang members to indicate that they are members of a Blood or Piru gang.  Defendant flashed different gang signs in reaction to the song.

Defendant walked over and confronted the group of Westside Pirus.  He challenged them to "go out to the parking lot" and told them to "stop being a little bitch." Gang signs were flashed again and somebody yelled out "Southside Compton Crips." People started running when the confrontation began and security escorted people out of the bar area. The sound of gunshots from outside was heard and people ran back inside the bar.  Paul Shepherd, a documented member of the Westside Pirus, who was dressed in red, ran into the bar and fell to the ground.  He suffered a gunshot wound to the upper abdomen and lower chest area, and was hospitalized for three weeks.

---

[4]    The abstract of judgment reflects an unauthorized sentence and is discussed in section VI, *infra*.

[5]    The abstract of judgment reflects otherwise and is discussed in section IX, *infra*.

The restaurant was equipped with four different surveillance cameras, one was located outside the front door, another in the foyer, and two in the bar area. Portions of the surveillance videos taken from the different camera angles were played for the jury. They were also shown still photographs taken from the videos.[6]

Richard Andrew Vasquez, a bartender at T.G.I. Friday's saw defendant in a corner of the bar area throwing up gang signs. He watched defendant move towards the middle of the bar area and get into an altercation with a group of people. Shortly afterwards he saw "the guy in the red shirt [Shepherd] comes in the bar, flops down, and he's shot." About a week after the shooting, Vasquez circled defendant's photo in a six-pack photo lineup. He identified defendant as the man he saw in the bar that night, and wrote, "Nose, lips looks exactly like the guy that was throwing up gang signs in the bar." He also identified defendant in surveillance clips showing defendant entering the bar, confronting the Westside Pirus, exiting the bar, and shooting Shepherd. Vasquez identified defendant in court and was "really sure" he was the man wearing a blue beanie and blue jacket that was throwing up gang signs in the bar on January 21, 2010.

Keny Quijano was an employee of T.G.I. Friday's. He wore a T-shirt marked "Security" and kept track of the number of people in the bar on karoke night by handing out wristbands. On the night of the shooting he stood by the back wall of the bar close to defendant. Defendant kept "running into [Quijano] the majority of the times" and had to "go through [Quijano] to get to the tables." Sometimes, Quijano had to "move a little bit, like, to the side for him to go through." Quijano saw the group of Westside Pirus throwing up gang signs and saw defendant approach them. On January 23, 2010, "within a matter of seconds" he identified defendant from a six-pack photo lineup and wrote, "This was the guy that was standing next to me." When shown a still photograph of the shooting taken from the surveillance video, Quijano identified defendant as the shooter.

---

[6]     People's exhibits 9 through 12 were CD's entitled "Entrance," "Confrontation," "Exit," and "Shooting." People's exhibits 14 through 17 were still photographs taken from the surveillance videos identifying defendant. People's exhibit 19 was a still photograph taken from the surveillance videos identifying Shepherd.

Quijano was able to recognize defendant because of the blue shirt and beanie and because Quijano stood next to him in the bar. Quijano was sure of his identification of defendant in court.

Latisha Doxie was working as a waitress in the bar that evening. She testified she saw a large African-American male approach another group in the bar. It appeared "as if something was bothering him" and then she heard "voices rising and an argument starting." When shown a still photograph taken from a surveillance video she identified an individual who was wearing a beanie as the person who approached the Westside Pirus. Phillip Wills, was the general manager of T.G.I. Friday's and became aware of an altercation in the bar area that evening. From a still photograph taken from a surveillance video he identified a large individual who was wearing a beanie and appeared to be African-American as someone involved in the confrontation. Neither Doxie nor Wills identified defendant at trial.

Shepherd testified that he grew up in a Westside Piru neighborhood but denied being a member of the gang. He had a cousin who was a member and Shepherd had a tattoo on his back that said "Piru Nation" with the number "82" in the middle, in honor of his cousin who died in 2006. He had been in the lock-up with defendant and was uncomfortable identifying anyone in court. He had no memory of the night of the shooting and did not want to testify.

Los Angeles County Sheriff's Department (LASD) Deputy Gabriela Hernandez responded to the scene and found two expended bullet casings in front of the restaurant. There was a bullet strike on the entrance near the door frame and a bullet hole inside the lobby. LASD Detective Eric Arias interviewed some of the witnesses at T.G.I. Friday's on the night of the shooting. Vasquez told Detective Arias that "a male Black in his mid to early 30's . . . wearing a dark blue or black beanie cap" stood next to Quijano. The man had a hard stance and Vasquez described him as "a hard-core O.G. gangster" because he was throwing up different gang hand signs while the Westside Pirus were throwing up their gang signs. Quijano told police that defendant was the one who said

6

"Southside Compton Crips."[7]  The day after the shooting Doxie told Detective Arias that she knew the large group of people she served in the bar were Westside Pirus because they wore red baseball caps with a white "W" and she heard them yelling out "Westside Piru."  She saw the "O.G. type" individual confront the Westside Piru group.  He was acting "extremely hostile" and she heard him repeatedly say "Fuck Piru" and "This is Southside."  Two days after the shooting Shepherd told Detective Arias he was at T.G.I. Friday's celebrating a friend's birthday when an African-American male approached one of Shepherd's friends and challenged him to go outside.  Shepherd decided to go outside anticipating a fist fight and was shot as he was about to exit T.G.I. Friday's.  He stumbled back inside the bar area and collapsed.

Long Beach Police Department provided the investigating officers with information that an individual named "H.K." from the 10-Deuce Budlong Gangster Crips was responsible for the shooting at T.G.I. Friday's.  Detective Arias was able to identify defendant from that particular gang.  On January 25, 2010, LASD Deputy Michael Jimenez saw defendant in the front passenger seat of a 2002 Lexus, in the area of Compton Boulevard and Willowbrook Avenue in the City of Compton.  The Lexus, which was driven by a female, pulled into a supermarket parking lot and stopped.  Deputy Jimenez and his partner, Deputy Sakavu, who were both in uniform, activated the take-down red light of their marked black and white patrol car, and exited their vehicle.  The Lexus drove through the parking lot and back onto the street, driving against traffic.  Deputies Jimenez and Sakavu, along with other police vehicles and a helicopter, pursued the Lexus.  The Lexus made a number of turns before slowing down as it came to a three-way intersection.  Defendant jumped out of the Lexus while it was moving at a speed of five to ten miles per hour and ran towards a parking lot.  Deputies Jimenez and Sakavu chased him on foot.  Defendant tried to climb a fence but fell to the ground.  He refused

---

**7**     Quijano also testified at a prior proceeding that defendant made the statement but at trial testified that he heard someone say "Southside Compton Crips" but was not certain it was defendant.

to comply with the deputies' orders to stay down and show his hands. Deputy Sakavu shot defendant with a Taser and he was taken into custody.

Deputy Jimenez found a loaded pistol in the Lexus on the right front passenger floorboard. There was a live bullet in the chamber, and an additional 16 live bullets in the magazine. The gun was a Tech-9 assault weapon. Detective Arias was present at the end of the pursuit. He testified defendant looked "essentially the same" at trial as he did the day he was arrested. Defendant appeared to have gained a little bit of weight and his hair appeared a little longer but otherwise looked the same.

Detective Arias, a sworn peace officer for 16 years and assigned to the gang unit referred to as Operation Safe Streets Bureau in Compton, testified as a gang expert. He received general gang training at the academy. He worked in a custody facility for two years after graduating from the academy, where he interacted, talked, and interviewed hundreds of gang members. He talked to them about their membership in gangs, how they got their monikers, and the types of crimes they committed for the benefit of the gang. After leaving the custody assignment, Detective Arias worked patrol for four years, where he came in contact with hundreds of gang members, and got to view their tattoos and again interviewed them regarding their gang involvement.

In 2002, Detective Arias transferred to the gang unit where he was currently assigned. His gang assignment at the Compton Station, where he only investigated gang crimes, was with a goal of acquiring intelligence on gang members, building a rapport with them, finding out what was going on in their neighborhoods, and monitoring crime trends. He attended conferences put on by the California Gang Investigators Association of which he is a member. He has authored in excess of 100 search warrants relating to gang crimes and assisted in service of a well over 500 search warrants of gang members' residences enabling him to study gang paraphernalia, and view their tattoos. Detective Arias testified as a gang expert in Los Angeles, Orange, and San Bernardino Counties.

Detective Arias was familiar with the Westside Piru gang and was responsible for investigating crimes committed by them. Westside Piru was a Compton based Bloods gang and historical enemies to Crips gang members. They associated with the color red

8

and typically wore a red baseball cap with a white "W" which stands for Westside. Detective Arias opined that Paul Shepherd was a member of the Westside Pirus based on several factors: Detective Arias had several contacts with Shepherd in the previous two to three years, during which Shepherd admitted being a member of the Westside Pirus and had the moniker "Two P's" which stood for "Piru Paul"; field interview cards dated June 7, 2003, February 1, 2006, and February 21, 2009, indicated that Shepherd self-identified with Westside Pirus on each of these occasions; and Shepherd had tattoos consistent with being a Westside Piru gang member, i.e., a large tattoo on his back said "Piru Nation."

Detective Arias defined the term "snitching" and its significance in gang culture. Cooperating with a police investigation in any way is considered snitching. Testifying in court and identifying somebody would be considered the ultimate form of snitching. Gang members typically abide by the street code and avoid snitching because it is never forgiven and "ultimately, you're retaliated against and killed for snitching on a gang member." It is not uncommon for a gang member to give truthful statements the day of an incident but change their story at trial because of fear of retaliation.

The 10-Deuce Budlong Gangster Crips (10-Deuce) was a South Los Angeles gang with whom Detective Arias was also familiar having had his patrol training at the Lennox Station in Inglewood. The boundaries of 10-Deuce territory included 102nd Street to the north, and Budlong Avenue to the east, and was the source of many of their signs and symbols, e.g., the numbers 102nd, or 10-Deuce, the number 10 with the number two, and the letters B.L.G.C. for Budlong Gangster Crips. They associated with the color blue, traditionally used by Crip gangs, and wore baseball caps with the "B" logo. Their biggest rival for the territory they claimed was the Hoover Crips. Their traditional rivals included Bloods and Pirus.

When asked about the primary activities of the gang, Detective Arias answered, "Vandalism, graffiti, possession of narcotics for sales, possession of weapons, possession of assault weapons, burglary, robbery, assault with a deadly weapon, and murder." The detective testified to the commission of three predicate crimes committed by 10-Deuce

9

gang members. Andrew Dennell Arthur was convicted of assault with a deadly weapon in 2008, Lamar Anthony James was convicted of robbery in 2009, and David Travon Andrew was convicted of possession of a firearm in 2009.

Detective Arias opined that defendant was a member of 10-Deuce based on several factors. First, Detective Arias reviewed field identification cards and spoke with detectives familiar with 10-Deuce and who had personal contacts with defendant. Defendant admitted his 10-Deuce membership to those detectives. Furthermore, in a recorded telephone call defendant made while in custody he said "I'm H.K. from Budlong Gangster Crips."[8]

Second, during the course of the investigation Detective Arias became more familiar with defendant after reviewing photographs and letters seized pursuant to a search warrant.[9] One letter which was addressed to defendant appeared to be from a fellow Crips gang member because of the style of writing. When writing, Crips members typically replace a "B" with a "C" and avoid using "ck" because it is used by Bloods to signify "Crip Killer." The letter examined by Detective Arias contained these distinguishing characteristics. A second letter was addressed to Penda Lee, defendant's former girlfriend, with defendant's name and address listed on the return area of the envelope. The letter stated "Missing you always" and contained a drawing of an individual wearing a Brooklyn Dodgers baseball cap favored by members of 10-Deuce, with a tattoo of "Budlong" on the forearm. One photograph showed defendant dressed in blue wearing a blue baseball cap with the letters "H.K.," which Detective Arias opined stood for "Hoover Killer" because the Hoover Crips were the main rival of 10-Deuce. Another photograph showed defendant throwing up the gang sign associated with

---

[8]     An audio recording of the jailhouse call made by defendant was played for the jury.

[9]     The warrant was executed at 1217 East Glencoe Street, in the City of Compton, which defendant testified was his home and was also connected to the Southside Compton Crips.

10

10-Deuce and wearing a baseball cap with the numbers "10" on it which Detective Arias opined stood for 10-Deuce.

Third, defendant was heavily tattooed with an assortment of images and references indicative of his gang membership. On one arm defendant had a tattoo which said "Snuva K." Snuva is a derogatory term for the Hoover Crips, and when followed by a "K" signifies Hoover Killer. Another tattoo was "BLGC" which Detective Arias opined stood for Budlong Gangster Crips. Underneath was a tattoo which said "H Kay" a reference to defendant's moniker "H.K." or "Hoover Killer." A tattoo, "RB," stood for "Regal Boys" which was a club that eventually evolved into the criminal street gang known as 10-Deuce. Defendant had "102" tattooed between his index finger and thumb, and "102 percent" tattooed on his chest. A cartoon figure wearing a Brooklyn Dodgers baseball cap with the letter B underneath was on the other arm, and a large tattoo of the letter "B" was on defendant's back.

Detective Arias was responsible for investigating crimes committed by the Southside Compton Crips gang and was familiar with them. The residence at 1217 East Glencoe Street, was in the geographical area claimed by the Southside Compton Crips. Defendant's former girlfriend, Penda Lee, and her son, a known member of Southside Compton Crips lived at the residence. A field identification card from April 2006 indicated that defendant was contacted at the Glencoe address in the company of two known members of Southside Compton Crips. Detective Arias was shown a still photograph taken from a video depicting the shooting at T.G.I. Friday's. He identified the individual standing next to the shooter as Darryl Bradford, a member of the Southside Compton Crips gang. Initially, Bradford was cooperative with Detective Arias and told what he knew about the incident. Bradford failed to respond to a subpoena to appear as a witness and a surveillance team from the gang unit attempted to locate him. His telephone was disconnected and he could not be found.

Responding to a hypothetical question based on the facts of this case, Detective Arias opined that the shooting would benefit the 10-Deuce Budlong Gangster Crips, and possibly also benefit the Southside Compton Crips. The gang culture involves respect

11

and gangs achieve their power through fear and intimidation. The gang with the most violent members willing to commit the most serious crimes is the most feared and intimidating. The presence of a Blood gang, the Westside Pirus, openly wearing their red colors, throwing up gang signs, and yelling their battle cry was a direct challenge to defendant who was clearly dressed in his Crips gang color of blue. As an original gangster with status within the gang, defendant had to respond. Defendant's propensity and willingness to commit a violent crime in a public place with video cameras and potential witnesses benefits the gang because "the crime itself is going to instill fear and intimidation in not only members of the Westside Piru, but also the general community, the civilian witnesses in there, who witnessed the shooting."

The Southside Compton Crips and the 10-Deuce, being Crip gangs, were natural enemies of any Blood or Piru gangs. By shouting the name "Southside Compton Crips" the shooting would benefit that gang by making people in the bar believe that it was committed by a member of that gang. Detective Arias opined that the Westside Pirus would be more familiar with the Southside Compton Crips because the smaller 10-Deuce were not generally recognized outside of their limited territory. If an individual is in an area where his gang is not known, he may yell the name of the local gang he is with to instill more fear.

### b.    Defense Evidence

Defendant testified in his own behalf and stated he was not at T.G.I. Friday's on the night of the shooting. He was at his home located at 1217 East Glencoe Street, in Compton with his ex-girlfriend, Penda Lee Williams. He was "hanging out" with Felicia Simmons, a female he knew, on the day he was arrested. As they were driving to the store she told him the "gang police" were behind them. Defendant looked in the mirror and saw the police follow them into the parking lot. Simmons, who was driving, "just took off" and "didn't say nothing." Defendant jumped out of the car when Simmons turned a corner. He ran to the parking lot of a post office but when he saw there was nowhere to go he turned around and gave up. The Tech-9 assault weapon did not belong to him, he did not place it in the car, and he never touched it.

12

Defendant was six feet two inches tall and weighed 283 pounds, and was about the same weight at the time of his arrest. He was not the large African-American man in the videos wearing a beanie because he only wore fitted baseball caps, not beanies. He explained that his tattoos were for personal reasons. His "H.K." tattoo represented the mother of his child, whose name was Honey K., and his "BLGC" tattoo stood for "bitches love gangster crew." Some members of his car club became gangsters but he denied any affiliation with gangs. He would never shout "Southside" because he was from Los Angeles.

Defendant had a sustained juvenile petition for assault with a deadly weapon, a conviction for possession of a controlled substance while in possession of a Tech-9 weapon, and a conviction for possession for sale of a controlled substance.

## DISCUSSION

### I. Prosecutorial Misconduct

#### A. Contention

Defendant contends the prosecutor committed misconduct during opening and closing arguments by superimposing defendant's image over a photograph taken from the surveillance video that showed the shooter holding the gun. Specifically, defendant contends the misconduct occurred because the prosecutor altered existing evidence in a way that was unfairly suggestive and unduly prejudicial, and created evidence that did not exist to encourage the jury to prejudge the case.

#### B. Waiver

The People assert that defendant waived or forfeited any claim of prosecutorial misconduct. A defendant alleging prosecutorial misconduct is required to make a timely objection, state his reason for the objection, and request the jury be admonished. (*People v. Brown* (2003) 31 Cal.4th 518, 553.) The admonishment requirement is subject to an exception for futility. (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.) "[F]ailure to request the jury be admonished does not forfeit the issue for appeal if '"an admonition would not have cured the harm caused by the misconduct."' [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

13

Defendant acknowledges his trial attorney did not request an admonition but argues it would have been disrespectful to the court to seek one. He contends his objections should be deemed preserved and addressed on the merits.

We agree that defense counsel should have sought a curative admonition, and therefore forfeited the objections on appeal. (*People v. Stanley* (2006) 39 Cal.4th 913, 952.) Nevertheless, we address the contention and conclude that defendant's prosecutorial misconduct claim fails on the merits.

### C.      *Proceedings Below*

Prior to opening statements, defense counsel objected to the prosecutor's proposed "juxtaposition" of defendant's booking photograph with a "surveillance photo still of the shooting." The prosecutor explained that she was "inserting the booking photo, the profile booking photo, into the surveillance still image" and stated that she would lay a foundation for every photograph that was in her PowerPoint presentation and would mark them as exhibits. The court asked the prosecutor if the image consisting of the booking photograph superimposed over the still photograph of the shooting would be an exhibit. Referring to the previous trials the prosecutor responded, "It wasn't in the past. It might be in time. We'll see." Defense counsel reiterated his objection that the People were distorting the evidence because they represented that the booking photograph and the surveillance photograph were not altered in any way but now superimposing "one upon the other alters the physical, tangible evidence the People are offering." The court stated that it could "see a scenario where you have the original video, and you could create a production where you then superimpose [the booking photograph], the jury sees that, and you would withdraw it, simply to show as an illustration that you believe that's—in argument that that's an image of the defendant." The court concluded it would be prejudicial to the defendant to create an exhibit that did not exist.

During the prosecutor's opening statement, defense counsel objected and a sidebar exchange took place. Defense counsel moved for a mistrial based on the prosecutor showing "the image of the shooting on the video surveillance superimposing [defendant's] booking photo," which he argued was not authorized by the court. The

14

prosecutor sought clarification of the earlier ruling and the court explained that he did not "watch exactly how the image came up, but if you then put in the original still photo and then you inserted as a new image to superimpose it on top of it, that would be acceptable." The prosecutor confirmed she did it that way, the objection was overruled, and the prosecutor continued with her opening statement.

During a break in testimony the prosecutor sought further clarification on the issue and asked if the court required her "to create an exhibit that has both of those photos on one piece of paper?" The court explained that the way the prosecutor presented it was appropriate because she "first showed the image . . . from the video, and then . . . the next step was the image of the booking photo that you were imposing into it." They were both separate exhibits and an image was created using the two separate images. Defendant objected to a similar slide the prosecutor intended to use in closing argument and the trial court overruled the objection.

### D.     *Relevant Authority*

"The applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.""' [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

Prosecutors have ""'"broad discretion to state [their] views as to what the evidence shows . . . ."'"' (*People v. Welch* (1999) 20 Cal.4th 701, 752.) A defendant's conviction will not be reversed for prosecutorial misconduct that violates state law unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1071.)

15

### E.    Analysis

The purpose of the opening statement is to prepare "'"the minds of the jury to follow the evidence and to more readily discern its materiality, force and effect" [citation]. . . .' [Citation.]" (*People v. Fauber* (1992) 2 Cal.4th 792, 827.)  The prosecutor's PowerPoint presentation did not mislead the jury into believing that defendant's image could clearly be identified from the surveillance video because of the manner in which the slides were presented.  The prosecutor told the jury that they were "going to see the surveillance video from the night of the shooting" and that Vasquez and Quijano were going to identify defendant "as being the shooter in that video."  The prosecutor did not create evidence as defendant contends by presenting a slide showing defendant's image in a photograph of the shooting from the surveillance video.  Instead, a still photograph taken from the surveillance video, which was later admitted as evidence, was first shown to the jury.  Defendant's booking photograph, which was also later admitted as evidence, was then superimposed over the photograph taken from the surveillance video.  The use of the two photographs to create the superimposed image was merely a visual aid to assist the jury in following the testimony of Vasquez and Quijano.  "The use of photographs . . . intended later to be admitted in evidence, as visual or auditory aids is appropriate." (*Ibid.*)

Defendant's contentions that the prosecutor altered existing evidence and created new evidence are without merit.  The still photograph taken from the surveillance video and defendant's booking photographs were properly admitted into evidence.[10]  The challenged slide comprised of the combined images was not shown to the jury outside of the prosecutor's opening and closing statements.  Nor did the prosecutor intend to mislead the jury.  In closing argument, the prosecutor acknowledged the surveillance video by itself was inconclusive for purposes of identifying defendant.  The prosecutor

---

[10]    Still photograph of shooter from surveillance video (People's exhibit 16), booking photographs of defendant (People's exhibits 35 & 36).

16

stated, "The defendant's image on that video, it's not crystal clear, like I said, but it fits the description that [Quijano] gave perfectly."

Citing *People v. Katzenberger* (2009) 178 Cal.App.4th 1260 (*Katzenberger*), defendant contends the use of the superimposed image subverted the deliberative process and invited the jury to jump to the conclusion that defendant was the person on the surveillance video.

In *Katzenberger,* the prosecutor's closing argument included a PowerPoint presentation in which six of eight puzzle pieces created a picture immediately and easily recognizable as the Statue of Liberty, although a portion of the statue's face and torch were not visible. (*Katzenberger, supra,* 178 Cal.App.4th at pp. 1264–1265.) Over defense objection, the prosecutor argued that even without the missing pieces, one would know beyond a reasonable doubt that the puzzle depicted the Statue of Liberty. (*Ibid.*) The appellate court concluded that the presentation was misleading, leaving the "distinct impression that the reasonable doubt standard may be met by a few pieces of evidence" and "invit[ing] the jury to guess or jump to a conclusion, a process completely at odds with the jury's serious task of assessing whether the prosecution has submitted proof beyond a reasonable doubt." (*Id.* at p. 1267.) The presentation had also suggested, erroneously, that proof beyond a reasonable doubt could be measured quantitatively at 75 percent (six of eight puzzle pieces). (*Id.* at pp. 1267–1268.) Though the prosecutor's actions were harmless in light of the jury instructions correctly defining reasonable doubt and the overwhelming evidence of the defendant's guilt, the presentation did amount to misconduct. (*Id.* at pp. 1268–1269, applying standard of prejudice articulated in *Chapman v. California* (1967) 386 U.S. 18, 24.)

Here, the prosecutor did not suggest that the reasonable doubt standard may be met by only a few pieces of evidence. Nor did the prosecutor attempt to quantify the concept of reasonable doubt as the *Katzenberger* court concluded the prosecutor did in that case. The prosecutor argued that while the video corroborated the witnesses' testimony, the jury should not make their decision "based on the video alone" because there was "enough evidence [to find defendant guilty] beyond a reasonable doubt without

17

the video." The prosecutor did not mention the standard of proof in connection with her presentation of the slide at issue here and we cannot infer that its use was egregious or reprehensible conduct by the prosecutor that rose to the level of misconduct.

Finally, no harm could have resulted. Prior to opening statements and also before closing argument and the commencement of deliberations, the trial court instructed the jury that what the attorneys said in their arguments was not evidence. We presume the jury followed this instruction. (*People v. Waidla* (2000) 22 Cal.4th 690, 725 ["The presumption is that limiting instructions are followed by the jury"]; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 ["The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions"].)

## II. Defense Motions to Dismiss Jurors

### A. Contentions

Defendant contends the trial court erred in denying defense motions to dismiss Juror Nos. 2 and 11. He contends that because Juror No. 2 expressed fear of a witness and also saw defendant in restraints during a break in trial, the totality of the circumstances indicated bias. Defendant also contends Juror No. 11 did not understand the burden of proof, disregarded the trial court's instructions not to talk to witnesses, and identified with the prosecution's gang expert demonstrating his bias. We find no merit to these contentions.

### B. Juror No. 2

#### 1. Factual Background

During a break in Shepherd's testimony, Juror No. 2 contacted the bailiff and asked to speak with the court in private. Juror No. 2 stated she lived in the same neighborhood as Shepherd and frequently saw him on the street. She covered her face during his testimony because she was scared and did not want him to see her. In response to questioning by the court, Juror No. 2 said her fear would not affect her ability to be impartial and would not influence her verdict. After Juror No. 2 left the courtroom, defense counsel had a "separate objection." Based on defendant's misconduct in the

18

courtroom during the previous trials and while in custody, the court ruled that defendant would be placed in a "restraint chair" during trial. Counsel stated that when they broke for lunch, Juror No. 2 walked back into the courtroom as the deputy was removing defendant from the courtroom. Counsel stated "It looked like she could see him being brought in because [the bailiff] asked her 'Can you wait outside, please?'" Counsel was concerned it would lead to speculation as to "why we bring him out of the courtroom without the jury present" and asked that Juror No. 2 be excused "for that reason." The court denied defense counsel's request stating the bailiff was very conscientious and that even if Juror No. 2 did see something "she's just expressed her commitment to fairness just a moment ago as it relates to both sides, so I don't think, even if she did see something like that, it's going to interfere or affect her as an impartial juror."

### 2. Applicable Legal Principles

Section 1089 authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is "found to be unable to perform his or her duty." A trial court "has broad discretion to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve." (*People v. Millwee* (1998) 18 Cal.4th 96, 142, fn. 19.) A juror's inability to perform "'must appear in the record as a "demonstrable reality" and bias may not be presumed.' [Citations.]" (*People v. Beeler* (1995) 9 Cal.4th 953, 975.) We review the trial court' determination for abuse of discretion and uphold its decision if it is supported by substantial evidence. (*People v. Boyette* (2002) 29 Cal.4th 381, 462.)

### 3. Analysis

The record does not support defendant's claim that Juror No. 2's ability to serve was compromised because she may have observed defendant on a single occasion in some form of restraints during a break in the proceedings. Juror No. 2's removal was not warranted and substantial evidence supports the trial court's conclusion that she was not biased. The court questioned Juror No. 2 in the presence of counsel regarding her fear of Shepherd. She assured the court that her fear would not affect the way she decided the case. She stated she could be fair to both sides in response to a question from the

prosecutor. Defense counsel had "no questions" when asked for his input. The court found Juror No. 2's assurances credible, despite her fear of Shepherd.

Secondly, it is not clear from the record that Juror No. 2 actually saw defendant in restraints because defense counsel's claim was based on the bailiff's request that Juror No 2 wait outside. Defense counsel stated "it looked like [Juror No. 2] could see" defendant.

In any event, any brief observation by a juror that defendant was in restraints would not support a conclusion that bias existed. The California Supreme Court has repeatedly held that a juror's brief observation of a defendant in restraints for the purpose of transporting the defendant outside the courtroom does not constitute prejudicial error. (*People v. Cunningham* (2001) 25 Cal.4th 926, 988; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 584; *People v. Duran* (1976) 16 Cal.3d 282, 287, fn. 2.) Sometimes, and as occurred here, "a jury inevitably will learn a defendant is in custody for the current charged offense." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1336.) Here, immediately prior to defense counsel's concern that Juror No. 2 may have observed defendant's restraints and become aware of his custody status, Shepherd testified that while he was in custody and traveling back and forth to court on the custody bus, he observed defendant. That afternoon immediately after the discussion regarding Juror No. 2's possible bias, defense counsel asked Shepherd "How many times did you see [defendant] in custody?" Shepherd responded he had seen defendant a number of times, and in response to defense counsel's further questions clarified that he was referring to defendant being in custody for this particular case. Defendant himself testified regarding "the tank downstairs" and how custodial prisoners "come up to this tank up here."

"The customary practice of utilizing physical restraints while transporting a prisoner from place to place, e.g., from jail to courtroom and back, is a matter of common knowledge and generally acknowledged as acceptable for the protection of both the public and defendant." (*People v. Jacobs* (1989) 210 Cal.App.3d 1135, 1141.) Given Juror No. 2's assurances that she could be fair to both sides, her brief observation of

20

defendant during transportation to and from the courtroom, did not establish good cause for her removal.

### C. Juror No. 11

#### 1. Factual Background

The morning after Detective Arias testified, the prosecutor informed the court that Jurors Nos. 1, 7 and 11 greeted Detective Arias as they walked into the courtroom. Detective Arias informed the court that one of the jurors told him "You did a really good job," to which he replied, "Thank you." Defense counsel moved for a mistrial on the grounds that the jurors had already started to form opinions, and asked that all three jurors be removed. The prosecutor suggested it could have been a benign comment meaning Detective Arias looked at them while testifying and spoke well, and did not mean they had formed an opinion about the evidence.

The court questioned Juror No. 11 in the presence of counsel. Juror No. 11 said he greeted Detective Arias and said "You did a good job, and I hope it's not going to take much longer than the case should be." The court reminded Juror No. 11 that he had been admonished not to speak to anybody regarding the case, and asked him why he spoke to the detective. Juror No. 11 stated "Just I seen him come through and testify so many times and I'm here too, and I just feel that we have been—be here and we going to sit through the same procedures for many, many days, just expressed that we doing the right thing for a long time." The court asked Juror No. 11 if he had made up his mind already, or had begun to make up his mind, as to whether the prosecution had proved their case. He responded that he had not made up his mind and would not do so until the case ended. The court invited counsel to question the juror:

"[DEFENSE COUNSEL]: Sir, just briefly, who has the burden of proof in the case?

"[JUROR No. 11]: Burden to prove the case?

"[DEFENSE COUNSEL]: Right.

"[JUROR No. 11]: The juror, and you are too.

21

"[DEFENSE COUNSEL]: Okay. So I have the same burden as [the prosecutor]; right?

"[JUROR No. 11]: Yes.

"[DEFENSE COUNSEL]: Okay. Thank you.

"[THE COURT]: Okay.

"[THE PROSECUTOR]: Sir, you understand that I have to prove the case to you; right?

"[JUROR No. 11]: Yes.

"[THE PROSECUTOR]: Okay. Nobody else has to prove anything; right?

"[JUROR No. 11]: Yes.

"[THE PROSECUTOR]: Okay. You're going to wait until you hear everything before you make a decision; right?

"[JUROR No. 11]: Yes. Yes."

The court briefly questioned Jurors Nos. 1 and 7. Juror No. 1 denied making any comment to Detective Arias and did not hear Juror No. 11 make any comment. Juror No. 7 also stated that he did not speak to Detective Arias. He did not know what Juror No. 11 said to Detective Arias but thought it was "a hello—it was just a two-second interchange."

Defense counsel requested that Juror No. 11 be removed because the juror was unclear about the burden of proof and had spoken to a witness. The prosecutor argued that Juror No. 11 did understand who had the burden of proof and thought he was confused about "who has to approve the case." The court noted that Juror No. 11 was Cambodian and worked at a Cambodian community organization and presumed that was his first language. The court also noted that during jury selection he was articulate and open-minded. The court agreed with defense counsel's view that Juror No. 11 tended to agree with whoever asked the question. The court reporter read back Juror No. 11's answers to defense counsel's questions. The court stated that Juror No. 11 may not have heard the question correctly and confused the terms "prove" and "approve." The court found no legal cause to remove Juror No. 11 stating: "My recollection during voir dire is

22

there was a lot of discussion about who has the burden of proof, what the standards are, and questions about if the defendant does not testify and exercises his right not to do so, as well as a whole range of other subjects, and there was not any misunderstanding at that phase."

### 2. Applicable Legal Principles

"Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence. [Citation.]" (*People v. Holt* (1997) 15 Cal.4th 619, 659; see also *People v. Williams* (1997) 16 Cal.4th 153, 232.)

### 3. Analysis

Here, the trial court questioned Juror No. 11 at length about the comments he made to Detective Arias when the matter was brought to the court's attention. The court needed to be satisfied that Juror No. 11 was not biased and that he understood the prosecution carried the burden of proof in order to perform his function as a juror. Juror No. 11 admitted speaking to Detective Arias and his recollection of the comments was corroborated by Detective Arias. He assured the court that he had not formed any opinion about the case and would not do so until all the evidence was presented. The court was also convinced that Juror No. 11 would follow the law and apply the correct standard with respect to the burden of proof. Having considered the juror's responses and demeanor, the trial court was in the best position to observe his demeanor and assess his credibility.

However, assuming arguendo that in talking to Detective Arias Juror No. 11 violated section 1122[11] and committed misconduct, we find that upon review the full

---

[11] Section 1122, subdivision (a)(1) provides in pertinent part: "That the jurors shall not converse among themselves, or with anyone else . . . ."

23

record does not show a reasonable probability that defendant's case was actually harmed by such misconduct.

First, in view of the ample evidence of defendant's guilt, it is highly improbable that defendant's case was actually harmed. (See *People v. Ryner* (1985) 164 Cal.App.3d 1075, 1082–1083; see *People v. Cochran* (1998) 62 Cal.App.4th 826, 831 [court may consider strength of prosecution's case to determine prejudice].) The shooting which was committed by a large African-American male wearing a blue beanie was captured on surveillance videotape. The victim, a member of a "Blood" gang was wearing red, while defendant a member of a "Crips" gang was wearing blue. Long Beach Police Department provided Detective Arias with information that an individual named "H.K." from the 10-Deuce Budlong Gangster Crips was responsible for the shooting at T.G.I. Friday's. Defendant was identified by a number of witnesses as the large African-American male wearing the blue beanie who had initiated a confrontation with the victim and his friends moments before the shooting.

Second, Juror No. 11's statement to Detective Arias was innocuous and considering the trial was entering its third week probably nothing more than a comment about the efficient nature of the testimony. The fact that the juror made the comment is at worst a trivial violation of section 1122's admonition against discussing the case with others. (See *People v. Ryner, supra,* 164 Cal.App.3d 1075, 1083 [record on full review revealed that juror's contact with another was insignificant and did not result in actual harm].)

Finally, jurors are presumed to follow jury instructions. (*People v. Frank* (1990) 51 Cal.3d 718, 728.) When the trial court called Juror No. 11 before it and reapprised the juror of his oath not to prejudge defendant and not to talk to anyone about the trial, it is presumed that Juror No. 11 did, *in fact*, follow the court's instructions. Accordingly, we find no substantial likelihood that Juror No. 11 was biased against defendant.

In light of the full record, we find no reasonable probability that defendant suffered actual harm as a result of Juror No. 11's comment to Detective Arias, and

therefore the presumption of prejudice is successfully rebutted. The trial court did not err in choosing not to dismiss Juror No. 11.

## III. Trial Court's Refusal to Instruct on Voluntary Manslaughter

### A. Contention

Defendant contends the trial court prejudicially erred by failing to instruct the jury on attempted voluntary manslaughter upon sudden quarrel or in the heat of passion as a lesser included offense of murder. Defendant maintains that the record contains sufficient evidence that he acted in response to adequate provocation.

### B. Proceedings Below

During the discussion on jury instructions among counsel and the trial court, defense counsel asked that the jury be instructed on attempted voluntary manslaughter. The trial court denied the request stating there was no evidence in the record "that shows any objectively reasonable provocation to substantiate the instruction on attempted voluntary manslaughter based on a theory of heat of passion or sudden quarrel."

### C. Relevant Authority

"The trial court is charged with instructing upon every theory of the case supported by substantial evidence . . . ." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) Substantial evidence is evidence that is "reasonable, credible and of solid value." (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1165; *People v. Crew* (2003) 31 Cal.4th 822, 835.) Pure speculation does not constitute the requisite substantial evidence sufficient to support a lesser included offense instruction. (*People v. Wilson* (1992) 3 Cal.4th 926, 942.) The failure to instruct on a lesser included offense is reviewed de novo. (*People v. Licas* (2007) 41 Cal.4th 362, 366 ['"We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense'"].)

"A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.]" (*People v. Moye* (2009) 47 Cal.4th 537, 549.) To satisfy the objective, or reasonable person, element of heat of passion voluntary manslaughter, the defendant's heat of passion must be attributable to sufficient provocation. (*Ibid.*) "To

25

satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.]" (*Id.* at p. 550.) "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201.)

The circumstances giving rise to the heat of passion are also viewed objectively. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 82–83.) A defendant may not set up his own standard of conduct and justify or excuse his acts because his passions were aroused, unless the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable person. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584; *People v. Oropeza, supra,* at pp. 82–83.) "The claim of provocation cannot be based on events for which the defendant is culpably responsible." (*People v. Oropeza, supra,* at p. 83.)

If the trial court fails in its duty to instruct on a lesser included offense supported by the evidence, the error is one of state law alone. (*People v. Breverman* (1998) 19 Cal.4th 142, 165.) It does not require reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome. (*Id.* at p. 178; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

### D.       *No Evidence Justified a Voluntary Manslaughter Instruction*

Here, there was no evidence from which the jury could conclude that defendant shot Shepherd in the heat of passion or sudden quarrel. There was no direct evidence concerning defendant's subjective mental state at the time of the shooting because he testified at trial and denied being present at T.G.I. Friday's on the night of the shooting.[12] Although the shooting was captured on surveillance video no witness testified that

_____

[12]       We note the defense was that defendant was not the person who shot Shepherd, "Donyell Butler did not shoot Paul Shepherd. He wasn't there" effectively rejected any attempted voluntary manslaughter theory.

26

defendant was provoked in any way by Shepherd, and Shepherd testified that he was shot as he exited the establishment.

The incident could not be characterized as a "sudden quarrel" because the evidence showed that defendant was standing some distance away when he saw rival gang signs being flashed. He walked over and confronted the group of Westside Pirus and challenged them to "go out to the parking lot" and told them to "stop being a little bitch."

The sequence of events was simply not one that would cause an ordinary person of average disposition to act in the heat of passion. Defendant contends that a jury could have found provocation from the verbal altercation in the bar. But there was no testimony that Shepherd flashed gang signs or shouted the Bloods gang name or "battle cry." This claim is without merit because the yardstick is not how defendant or an active gang member would react. Defendant is not entitled to set up his own standard of conduct. (*People v. Manriquez, supra,* 37 Cal.4th at p. 584 [defendant cannot create an unreasonably heightened sense of injustice in order to justify his conduct].)

## IV. Jury Instruction—Failure to Explain or Deny Adverse Testimony

Defendant contends it was error for the trial court to instruct the jury with CALCRIM No. 361 (failure to explain or deny adverse testimony).

We review a claim of instructional error de novo. (*People v. Alvarez* (1996) 14 Cal.4th 155, 217; *People v. Burch* (2007) 148 Cal.App.4th 862, 870 [validity and impact of jury instructions reviewed independently because "question is one of law and the application of legal principles"]; see also *People v. Smith* (2008) 168 Cal.App.4th 7, 13 [propriety of jury instructions determined from the entire charge from the court and not from consideration of specific instructions in isolation].)

As used at this trial, CALCRIM No. 361 provided: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If

27

the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

CALCRIM No. 361 should not be given when a defendant testifies and "explains or denies matters within his or her knowledge, no matter how improbable that explanation may appear." (*People v. Kondor* (1988) 200 Cal.App.3d 52, 57 [addressing CALJIC No. 2.62, the precursor to CALCRIM No. 361].)  CALCRIM No. 361 is properly given when the defendant testifies "but fails to deny or explain inculpatory evidence." (*People v. Sanchez* (1994) 24 Cal.App.4th 1012, 1029 [also addressing CALJIC No. 2.62].)  Contrary to defendant's assertions, the cases he cites do not support the rule that a defendant's testimony precludes the use of CALCRIM No. 361 even when his or her testimony explains or denies only some matters within his or her knowledge, but not other matters.  Instead, CALCRIM No. 361 is improper only when a defendant has explained "all the facts within his knowledge." (*People v. Kondor, supra,* at p. 57; *People v. Saddler* (1979) 24 Cal.3d 671, 683 ["Since there were no facts or evidence . . . which defendant failed to explain that were in his particular knowledge to explain," it was error to instruct with CALJIC No. 2.62].)

Defendant provided "personal reasons" for only some of his tattoos but for purposes of this discussion we will accept his argument that he explained all the ones he was specifically asked to explain.  Defendant also points out that he denied gang membership, denied being present at the scene of the crime, and presented an alibi defense.  We depart from defendant when he argues this made instruction with CALCRIM No. 361 improper because we find he did fail to explain inculpatory evidence within his knowledge.

Defendant denied gang membership and when asked, "Well, don't you actually go by the name of H.K.?" responded, "No."  When defendant was asked if he heard the recorded jail telephone call in which he described himself as "H.K. from Budlong Gangster Crips," he simply responded, "Yes," and did not offer any further explanation. In light of his previous denials, and assuming defendant had knowledge of why he would refer to himself by a gang moniker and claim affiliation with a gang, it reasonably could

28

be expected that he would explain the significance of the statement. Defendant was also asked by defense counsel to describe the events surrounding the end of the vehicle pursuit on the day he was arrested. Defendant testified that as Simmons turned a corner he "jumped out and ran." He added "When I got in the parking lot, I noticed there was nowhere to go. I ran and there was a big, old gate with barbed wire, so I turned around and gave up." Defendant offered no explanation as to why he ran from the police and since it can reasonably be assumed he knew the reason for his flight, his failure to explain his conduct supported the prosecutor's theory that the flight evidenced consciousness of guilt.

Moreover, assuming instruction with CALCRIM No. 361 was an error, we would not reverse. Under Supreme Court precedent, we review the CALCRIM No. 361 error under the harmless error standard articulated in *People v. Watson, supra,* 46 Cal.2d at page 836. (See *People v. Saddler, supra,* 24 Cal.3d at p. 683.) Under this standard, our task is to determine whether it is "reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*People v. Watson, supra,* at p. 836.) We find CALCRIM No. 361 did not affect the result in defendant's trial.

To the extent defendant contends the instructional error resulted in constitutional error because it may have lowered the prosecution's burden of proof in the eyes of the jury, we are certain beyond all doubt that the result of defendant's trial would have been the same had the trial court not instructed with CALCRIM No. 361. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

## V.     Defense Objection to Hypothetical Question

Defendant contends the trial court erred in overruling a defense objection to a hypothetical question posed to the prosecution's gang expert, Detective Arias, because it included facts not admitted as evidence.

In discussing the breadth of a trial court's discretion in applying the principles governing hypothetical questions, the California Supreme Court noted that "[i]t is not essential . . . that the facts assumed should be undisputed." (*Guardianship of Jacobson*

(1947) 30 Cal.2d 312, 324 (*Jacobson*).) Rather, hypothetical questions are proper as long as they are based on "facts within the possible or probable range of the evidence" and are "not unfair or misleading." (*Ibid.*) The trial court has "large discretion relating to the form of the question." (*Ibid.*)

Because a trial court hears all the evidence, that court is in the best position to decide if a hypothesis is within the "possible or probable range" of that evidence (*Jacobson, supra,* 30 Cal.2d at p. 324), and it therefore deserves a measure of latitude in doing so. The trial court can also best determine whether, ultimately, the testimony will help the trier of fact evaluate the issues it must decide. (*People v. Richardson* (2008) 43 Cal.4th 959, 1008.) This court reviews a trial court's rulings on hypothetical questions for abuse of discretion. (See, e.g., *id.* at p. 1009.)

Defendant identifies the following inaccuracies in the prosecution's lengthy hypothetical: (1) defendant was the aggressor; (2) only one witness heard defendant invite the Westside Pirus to take their disagreement outside and therefore the use of the plural "witnesses" was misleading; (3) there was no evidence defendant went outside of his own volition so the use of the phrase "H.K. goes outside" was misleading; (4) there was no evidence that Paul Shepherd's moniker was "Two P's"; and (5) there was no evidence that defendant was accompanied by a "known documented member of the Southside Compton Crips."

Defendant's claim is meritless as the hypothesized facts were within the "possible or probable range" of the evidence, and were not "unfair or misleading." (*Jacobson, supra,* 30 Cal.2d at p. 324.) First, defendant was the aggressor. Quijano and Vasquez testified that the fight broke out soon after defendant walked over and confronted the Westside Pirus. Second, the use of the term "witnesses" was appropriate because more than one person heard defendant challenge the Westside Pirus to go outside. Quijano testified that he heard defendant say so, and Shepherd told Detective Arias that the individual at the bar that confronted his friends challenged them to go outside. "[D]irect testimony is not required" to support a hypothesized fact as long as the fact is "fairly inferable from the circumstances proved." (1 McCormick on Evidence (6th ed. 2006)

30

Requirement of Firsthand Knowledge, § 14, p. 89, fn. omitted.)  Third, the phrase "H.K. goes outside" was not misleading.  Defendant was identified on surveillance video inside the bar during the initial confrontation and at some point exited the bar prior to the shooting outside.  The statement "H.K. goes outside" did not specify how he went outside and was merely a neutral statement in the sequence of events.  Fourth, there was evidence that Paul Shepherd's moniker was "Two P's."  Detective Arias testified that Paul Shepherd was known to him and "Mr. Shepherd has admitted to me to being a member of the Westside Piru gang with a moniker or gang name of Two P's."  Finally, the evidence that defendant was accompanied by a "known documented member of the Southside Compton Crips" was presented by Detective Arias.  He testified that when shown a photograph from the surveillance camera of the shooting he identified Darryl Bradford, a member of the Southside Compton Crips, standing just above the shooter.

## VI.    Gang Enhancement on Count 3 for Possession of an Assault Weapon

Defendant contends, and the People agree, that the trial court imposed an incorrect sentence on the gang enhancement on count 3 for possession of an assault weapon.

The trial court sentenced defendant to a term of one year and four months for the substantive offense (one-third the mid term of two years, doubled pursuant to the Three Strikes law).  Based on the true finding on the gang allegation, the court sentenced defendant to an additional term of one year and eight months (calculated as one-third of the five-year term set forth in section 186.22, subdivision (b)(1)(B)).

Section 186.22, subdivision (b)(1)(A), provides that:  "Except as provided in subparagraphs (B) and (C), the person shall be punished by an additional term of two, three, or four years at the court's discretion."  Subparagraphs (B) and (C) apply to serious felonies (§ 1192.7, subd. (c)) and violent felonies (§ 667.5, subd. (c)), and they authorize imposition of five- and 10-year enhancements, respectively.

Possession of an assault weapon is not a serious felony and a calculation based on a five-year enhancement was unauthorized.  An unauthorized sentence may be corrected at any time.  (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.)  Therefore, the gang

enhancement must be modified to a term of one year, calculated as one-third the midterm of three years.

## VII.  Presentence Custody Credits

Defendant contends the trial court erred in failing to award him presentence custody credits.  The People agree, and so do we.[13]

Section 2933.1 provides, in pertinent part:  "(a) . . . [A]ny person who is convicted of a felony offense listed in subdivision (c) of Section 667.5 shall accrue no more than 15 percent of worktime credit . . . .  [¶] . . . [¶]  (c) Notwithstanding Section 4019 [which authorizes presentence conduct credit] or any other provision of law, the maximum credit that may be earned against a period of confinement in . . . a county jail, . . . following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)."

Defendant was convicted of attempted willful premeditated murder, in violation of sections 664, 187, subdivision (a).  Thus, defendant committed an offense that is a violent felony within the meaning of section 667.5, subdivision (c).  Section 667.5, subdivision (c)(12), provides that a "violent felony" includes "(12) Attempted murder." Accordingly, defendant is entitled to the following custody credits:  603 days of actual custody credit and 90 days of conduct credit (603 days x 15 percent=90.45 days) for a total of 693 days (603 days+90 days).

## VIII.  Sufficiency of Evidence That Defendant Was the Shooter

Defendant contends there was insufficient evidence that he was the individual that shot Shepherd, and his convictions in counts 1 and 2 must be reversed.

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to

---

[13]    At the sentencing hearing the trial court did not disagree when defense counsel claimed that defendant was entitled to 90 days of conduct credit.  However, both the minute order for the date of sentencing and the abstract of judgment reflect that defendant was awarded 603 days of actual custody, and zero days conduct credit.

determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

Quijano described a large African-American man, wearing a blue shirt and blue beanie that had been standing close to him in the bar on the night of the shooting. He saw the man flash gang signs and approach a group of people wearing red that had flashed different gang signs and shouted out the name Westside Piru. He saw an argument develop and everybody run. At trial, Quijano identified the man in the blue beanie as defendant. He also identified defendant from a six-pack photo lineup and wrote, "This was the guy that was standing next to me." Quijano identified defendant from a still photograph taken from the surveillance video which depicted the shooter, noting that defendant was wearing the same clothing and beanie as the person he had seen inside the bar. When questioned further regarding the identification, Quijano stated, "He was next to me that night. I mean, I cannot forget that he was next to me."

Vasquez was working as a bartender at T.G.I. Friday's on the night of the shooting and saw a large African-American male in the corner of the bar area throwing up gang signs. The individual was wearing a blue shirt and blue beanie and he saw him move towards the middle of the bar area where the Westside Piru group were gathered. He saw a pushing match develop and a chair thrown on top of a table. At trial, Vasquez identified the man in the blue beanie as defendant. He also selected defendant's photo from a six-pack photo lineup and identified defendant in various surveillance clips showing defendant entering the bar, confronting the Westside Pirus, exiting the bar, and shooting Shepherd.

Other evidence corroborated the witness identifications made by Quijano and Vasquez. Defendant was a documented member of a Crips gang (10-Deuce) and had numerous ties to another larger Crips gang (Southside Compton Crips) that were better known in the geographical area where T.G.I. Friday's was located. Defendant's residence was in Southside Compton Crips territory, his girlfriend had a son who was a member of Southside Compton Crips, and Darryl Bradford, a known member of the Southside Compton Crips was standing next to the shooter in the surveillance video photograph of the shooting. Quijano told police, and testified at a prior proceeding that he heard defendant say "Southside Compton Crips," and Doxie, the waitress at the bar, told Detective Arias that she heard the individual who confronted the Westside Pirus say, "This is Southside."

Defendant raises the unreliability of eyewitness identifications in general and points to Quijano's inability to identify defendant at the preliminary hearing. Quijano explained that he was confused when he was asked at the preliminary hearing if he recognized anyone in court. He thought he was being asked if he recognized anyone in the audience and after looking around replied "Not really." He did not understand that he was being asked if he recognized the person standing next to him in the bar on the night of the shooting.

Defendant also contends that (1) there were no facts to support the state's theory that defendant's moniker was "H.K."; and (2) Detective Arias did not cite any specific instance of a conflict between defendant's Crips affiliated gang, and the Bloods affiliated Westside Piru gang. This ignores the extensive testimony by Detective Arias regarding defendant's gang related tattoos and specifically one which said "H Kay" and also overlooks the recorded telephone call defendant made while in custody, in which he said "I'm H.K. from Budlong Gangster Crips." Furthermore, Detective Arias testified that defendant's gang similar to most Crip gangs are traditional rivals of Blood gangs.

It is defendant's burden to "*affirmatively demonstrate* that the evidence is insufficient." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) We do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34

34

Cal.4th 1149, 1181.)  Reviewing the evidence in the light most favorable to the judgment, we are satisfied that substantial evidence supports defendant's convictions.

## IX.     Abstract of Judgment

### A.     *Sentence on Count 3*

The abstract of judgment contains clerical errors with respect to the sentence on count 3 which must be corrected to accurately reflect the trial court's pronouncement of sentence.

The trial court sentenced defendant to a term of one year and four months for the substantive offense (one-third the mid term of two years, doubled pursuant to the Three Strikes law).  The abstract of judgment reflects that defendant was sentenced to a term of one year with an additional one-year sentence pursuant to the Three Strikes law.

Furthermore, the abstract of judgment reflects that defendant was sentenced to a term of three years and four months for the gang enhancement pursuant to section 186.22, subdivision (b)(1)(C).  As discussed in section VI., *ante*, that sentence must be modified to reflect a sentence of one year, and the abstract of judgment must be corrected to reflect the sentence is pursuant to section 186.22, subdivision (b)(1)(A).

### B.     *Mandatory Fees to be Modified*

In its oral pronouncement of judgment the court imposed the following mandatory fees:  ". . . a court security fee of $60 and a court construction fund assessment of $40."  The abstract of judgment reflects a court security fee (§ 1465.8) in the amount of $120, and a criminal conviction assessment (Gov. Code, § 70373) in the amount of $30.  Defendant contends the cases should be remanded to the trial court to clarify the conflict between the oral pronouncement of judgment and the abstract of judgment.

It is generally true that the oral pronouncement of judgment controls.  (*People v. Mesa* (1975) 14 Cal.3d 466, 471.)  However, when an assessment is mandatory, its "omission may be corrected for the first time on appeal."  (*People v. Castellanos* (2009) 175 Cal.App.4th 1524, 1530, citing *People v. Smith* (2001) 24 Cal.4th 849, 852 [sentencing errors "correctable without referring to factual findings in the record or

remanding for further findings are not waivable"].) This is true even if the prosecutor failed to object in the trial court. (*People v. Talibdeen* (2002) 27 Cal.4th 1151, 1157.)

The court security fee and the criminal conviction assessment are mandatory fees and fines and therefore remand is not required. Instead, the judgment will be modified to impose the mandatory fees and fines and the abstract will be corrected to reflect the modified judgment.

Under section 1465.8, subdivision (a), a $40 court assessment "shall be imposed" on every felony criminal conviction. One fee of $40 should be imposed for each conviction. (*People v. Roa* (2009) 171 Cal.App.4th 1175, 1181.) Defendant was convicted of three offenses and the trial court was required to impose a $40 fee for each conviction, for a total of $120.

Under Government Code section 70373, subdivision (a), a $30 court assessment "shall be imposed" on every felony criminal conviction. One fee of $30 should be imposed for each conviction. (*People v. Lopez* (2010) 188 Cal.App.4th 474, 480.) Defendant was convicted of three offenses and the trial court was required to impose a $30 fee for each conviction, for a total of $90.

**DISPOSITION**

The judgments are modified as follows: the gang enhancement term of one year and eight months imposed under section 186.22, subdivision (b)(1)(B) on count 3 is stricken, and a one-year term pursuant to section 186.22, subdivision (b)(1)(A) is imposed; a $40 court security fee pursuant to section 1465.8 should be imposed on each count, for a total of $120; a $30 court construction assessment pursuant to Government Code section 70373, subdivision (a) should be imposed on each count, for a total of $90; and defendant is awarded 693 days presentence credit consisting of 603 days actual custody credit and 90 days of conduct credit.

The abstracts of judgment should also be corrected to reflect that defendant was sentenced to a term of one year and four months for the substantive offense in count 3.

The trial court is directed to prepare new abstracts of judgment reflecting the modified judgments and to forward a copy of each to the Department of Corrections and Rehabilitation. In all other respects, the judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
                        CHAVEZ

We concur:

_____, P. J.
        BOREN

_____, J.
        ASHMANN-GERST

37